**Daniel JACOBS, Petitioner**

v.

**Martin HORN, Commissioner, Pennsylvania Department of Corrections; Conner Blaine, Jr., Superintendent of the State Correctional Institution, Greene County; and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview, Respondents**

No. 3:99CV1203.

United States District Court, M.D. Pennsylvania.

Feb. 20, 2001.

Daniel Jacobs, Waynesburg, PA, Matthew C. Lawry, Defender Assn. of Philadelphia, Capital Habeas Corpus Unit, Fed. Ct. Div., Philadelphia, PA, Stuart Lev, Defender Association of Philadelphia, Fed. Court Div., Capital Habeas Corpus Unit, Philadelphia, PA, for Daniel Jacobs.

Christy H. Fawcett, Office of Attorney General, Capital Litigation Unit, Harrisburg, PA, Jonelle L. Harter, Office of Attorney General, Capital Litigation Unit, Harrisburg, PA, for Martin Horn, Conner Blaine, Jr., Joseph P. Mazurkiewicz.

### MEMORANDUM

MUNLEY, District Judge.

In this habeas corpus action, we are asked to determine the constitutionality of Petitioner Daniel Jacobs' conviction of first degree murder and his sentence of death. The respondents are Martin Horn, Commissioner, Pennsylvania Department of Corrections; Conner Blaine, Jr., Superintendent of the State Correctional Institution, Greene County; and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview. The petitioner raises a multitude of issues involving alleged errors of the trial court and ineffectiveness of counsel. With one exception, we find all of petitioner's arguments to be either without merit or moot. However, because we find, for the reasons which follow, that the petitioner's death sentence violates the Constitution of the United States, we will conditionally grant the petition for a writ of habeas corpus.

### Background

In 1992, a York County Court of Common Pleas jury convicted the petitioner of two counts of first degree murder for the slaying of his girlfriend, Tammy Mock, and their infant daughter, Holly Jacobs. The victims' bodies were found in the apartment where they had lived with the petitioner. Tammy Mock had been stabbed over 200 times and Holly Jacobs, who was seven months old, drowned in the bathtub. For Tammy Mock's death, petitioner was sentenced to die. He received a life sentence for Holly Jacobs' death. The facts are addressed with more particularity where appropriate below.

### Standard of Review

Petitioner is seeking a writ of habeas corpus. A district court's power to grant habeas corpus relief to a state prisoner is outlined in 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 2254(a), a federal court is required to consider only petitions which challenge a state court judgment based upon a violation of the Constitution or the laws or treaties of the United States. In addition, it is required that the petitioner exhaust his state court remedies before bringing a federal habeas corpus action. 28 U.S.C. § 2254(b), *Werts v. Vaughn,* 228 F.3d 178, 192 (3d Cir.2000). This exhaustion requirement does not apply where there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1)(B)(i) and (ii).

Section 2254 proceeds to state:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA") went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254. The above-quoted language is part of the amendment. Because Jacobs filed his petition on July 9, 1999, after the effective date of the AEDPA, we are required to apply the amended standards to his claim for federal habeas corpus relief. *Werts,* 228 F.3d at 195.

The Third Circuit has discussed the standard of review as follows:

The AEDPA increases the deference federal courts must give to the factual findings and legal determinations of the state courts. *See Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir.1996). Federal habeas corpus relief is precluded as to any claim that was adjudicated on the merits in a state court proceeding unless such adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§ 2254(d)(1) and (2) (1997). Factual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (1997).

*Id.* at 196.

In *Williams v. Taylor,* the United States Supreme Court provided the following interpretation to the habeas corpus § 2254(d)(1) standard of review:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to...clearly established Federal law as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of...clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materiality indistinguishable facts. Under the "unreasonable application" clause, a federal habeas corpus court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

By way of explanation, Third Circuit Court of Appeals has held the § 2254(d)(1) requires a federal habeas court to make two inquiries:

First, the federal habeas court must determine whether the state court decision was "contrary to" Supreme Court precedent that governs the petitioner's

claim. Relief is appropriate only if the petitioner shows that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *O'Brien [v. Dubois]*, 145 F.3d [16, 24–25 (1st Cir.1998)]. In the absence of such a showing, the federal habeas court must ask whether the state court decision represents an "unreasonable application of" Supreme Court precedent: that is, whether the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. If so, then the petition should be granted. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 891 (3d Cir.1999) *cert. denied sub nom Matteo v. Brennan*, 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62 (1999) *quoted in Werts*, 228 F.3d at 196–97.

■ Consequently, two distinct steps are necessary for our analysis of the petitioner's claims. First, we examine the claims under the "contrary to" provision. We must identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim. In *Matteo*, the Third Circuit Court of Appeals held:

> [I]t is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that the Supreme Court precedent *requires* the contrary outcome. This standard precludes granting habeas relief solely on the basis of simple disagreement with a reasonable state court interpretation of the applicable precedent. (emphasis in original)

*Matteo*, 171 F.3d at 888.

If it is determined that the state court's decision is not "contrary to" the applicable United States Supreme Court precedent, we move on to the second step of the analysis, that is whether the state court decision was based on an "unreasonable application of" Supreme Court precedent. This step requires more than a disagreement with the state court's decision or ruling because we would have reached a different result. *Werts*, 228 F.3d at 197. The AEDPA prohibits such *de novo* review. *Id.* Rather, we must determine whether the state court's application of United States Supreme Court precedent was objectively unreasonable. *Id.* That is, we must decide whether the state court's application of Supreme Court precedent, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. *Id.*

To summarize, we are empowered to grant relief only in the following two instances: 1) the petitioner demonstrates that Supreme Court precedent requires an outcome contrary to that reached by the state court; or 2) the state court decision represents an unreasonable application of Supreme Court precedent.[1] In other words, the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. *Matteo*, 171 F.3d 877, 891 (3d Cir.1999). With this analytical framework in place, we will address the petitioner's claims.

**Procedural history**

The procedure for capital cases in Pennsylvania is for the defendant to be tried in a county court of common pleas. The defendant is able to file post-trial motions with the trial court. Then the defendant is entitled to an automatic direct appeal to the Pennsylvania Supreme Court. After the direct appeal, the defendant can seek relief under the Post Conviction Relief Act, (hereinafter "PCRA"). PCRA relief is first addressed by the court of common pleas and is then appealable to the Pennsylvania Supreme Court.

---

1. Even though the statute is written in terms of Supreme Court precedent, we are free to examine other lower federal court decisions on issues that the Supreme Court has yet to address. *Matteo,* 171 F.3d at 890.

In the instant case, the petitioner followed the above procedure as follows: The verdict invoking the death penalty was entered on September 18, 1992. Trial counsel filed a motion for a new trial with the trial court. Doc. 13, Respondents' Appendix (hereinafter "Res.App.") 10. The trial court denied the motion with a written opinion on January 14, 1993, and formally imposed the death sentence on January 28, 1993. Res.App. 11, 12. The judgment of sentence was affirmed by the Pennsylvania Supreme Court. *Commonwealth v. Jacobs*, 536 Pa. 402, 639 A.2d 786 (1994).

The current petitioner then filed a *pro se* PCRA petition on January 13, 1997. Res.App. 14. On January 24, 1997, J. Richard Robinson, Esquire was appointed counsel for Jacobs, and a supplemental PCRA petition was filed on May 23, 1997. Res.App. 14, 15. The supplemental PCRA petition was orally amended at the PCRA hearing on May 29, 1997. Doc. 10, Response to petition for writ of habeas corpus, ¶ 15. The trial court denied the PCRA petition on June 13, 1997. Res. App. 17. On that same day, a notice of appeal to the Pennsylvania Supreme Court was filed. Subsequently, Robert Dunham, Esquire, of the Center for Legal Education Advocacy and Defense Assistance entered his appearance on behalf of petitioner. The Pennsylvania Supreme Court affirmed the trial court's denial of PCRA relief on March 26, 1999. *Commonwealth v. Jacobs*, 556 Pa. 138, 727 A.2d 545 (1999). On July 8, 1999, Matthew Lawry, Esquire, and Stuart Lev, Esquire, of the Defender Association of Philadelphia entered their appearances on behalf of the petitioner, and the instant petition for a writ of habeas corpus was filed on November 16, 1999.

Petitioner raises the following fifteen issues: 1) Counsel was ineffective for failing to investigate and present mental health mitigating evidence concerning petitioner's cognitive and emotional impairments and evidence that he suffers from the effects of a traumatic and neglectful childhood; 2) The trial court and trial counsel failed to ensure through voir dire that petitioner would be tried by a fair and impartial jury, and trial counsel was ineffective for failing to request a change of venue despite pretrial publicity; 3) Counsel was ineffective for failing to adequately investigate and present evidence supporting the diminished capacity defense; 4) Counsel was ineffective for failing to impeach the testimony of petitioner's mother with evidence that she had a long history of alcoholism and was intoxicated when purported admissions were made; 5) Petitioner was denied a fair trial and effective assistance of counsel when the trial court permitted lay opinion testimony from a police officer that all of petitioner's wounds were self-inflicted; 6) The trial court erred in failing to instruct the jury that it must find independent evidence that *corpus delicti* exists beyond a reasonable doubt prior to considering petitioner's statements, and prior counsel was ineffective for not raising this issue; 7) The Commonwealth failed to prove beyond a reasonable doubt that the petitioner murdered Holly Jacobs; 8) The prosecutor engaged in improper argument, defense counsel ineffectively failed to object, and the court took no action to cure the error; 9) The trial court's instructions on the torture aggravating circumstance were vague, over broad, and in violation of petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution; 10) The court's charge prevented the jury from considering and giving full effect to the mitigating evidence regarding age in violation of the Eighth and Fourteenth Amendments; 11) The trial court erred in failing to instruct the sentencing jury that, if sentenced to life, petitioner would be ineligible for parole; 12) The prosecutor improperly told the jury that it should show petitioner the same mercy he showed the two decedents, misstated the evidence regarding remorse and urged the jury to rely upon the prosecutor's personal opinion regarding what the evidence showed; 13) Petitioner's death sentence is invalid because he did not receive the meaningful "propor-

tionality review" mandated by 42 Pa.C.S.A § 9711(h)(3)(iii) and the Eighth and Fourteenth Amendments; 14) To the extent that state court counsel failed to raise and/or properly litigate the issues discussed in his habeas corpus petition, they were ineffective; and 15) Petitioner is entitled to relief because of the cumulative prejudicial effect of the errors in this case.

According to the respondents these claims can be broken down into three kinds: 1) claims that are exhausted, having been presented to and addressed by the Pennsylvania Supreme Court; 2) claims that were raised for the first time in state court on appeal to the Pennsylvania Supreme Court from the trial court's denial of PCRA relief, which the court found to be waived as a matter of state procedural law; and 3) unexhausted claims that were never presented to the state court for review and are procedurally barred from being raised at the current time.

**Exhaustion analysis**

Initially, therefore, it is important to address the issue of which claims the petitioner is entitled to bring in a habeas corpus petition. The law provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that-
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

 "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he pres-

ents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Accordingly, for a habeas corpus claim to be heard on its merits in federal court, the petitioner must first exhaust his state court remedies. "This exhaustion requirement is predicated on the principle of comity which ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions and preserves the role of state courts in protecting federally guaranteed rights." *Werts,* 228 F.3d at 192.

In the instant case, the Pennsylvania Supreme Court found that some of the petitioner's claims were waived and therefore, did not address their merits. The claims were considered waived because the Supreme Court found that they were not raised in the lower court PCRA proceeding. *Commonwealth v. Jacobs,* 556 Pa. 138, 727 A.2d 545, 549–50 n. 9 (1999).[2] The first question we are faced with is whether the federal courts can address the merits of the issues that were procedurally defaulted in state court.

 To decide whether the merits of constitutional claims that were waived in state court can be heard in federal court, it must be ascertained whether the state procedural rule (that barred review in state court) is "adequate" to support the court's decision "independent" of the merits of the federal claim. *Harris v. Reed,* 489 U.S. 255, 260, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). This "adequate and independent" analysis requires us to determine whether the rule is a firmly established and regularly followed state practice because only such a rule can be interposed by a state to prevent subsequent federal review of constitutional claims. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Banks v. Horn,* 126 F.3d 206, 211 (3d Cir.1997). The Third Circuit

---

**2.** If a claim is waived it can still be heard by the Pennsylvania Supreme Court if it is raised in terms of prior counsel's ineffectiveness for failing to argue the issue in the earlier proceeding. *See, id.*

Court of Appeals has held that state procedural rules provide independent and adequate basis for precluding federal review of a state prisoner's habeas corpus claims only if the following three criteria are met: 1) the state procedural rule speaks in unmistakable terms; 2) all state appellate courts refused to review petitioner's claims on the merits; and 3) the state courts' refusal is consistent with other decisions— that is, the state rule is consistently and regularly applied. *Doctor v. Walters*, 96 F.3d 675, 683–84 (3d Cir.1996). In the instant case, the first two factors are clearly met, and the third factor is the only one we need discuss.

■ Accordingly, we must determine whether the state rule in the instant case was a firmly established and regularly followed state practice. The Pennsylvania Supreme Court did not provide a detailed analysis of the waiver rule it was applying in the instant case. It merely stated as follows: "The remainder of the claims raised by Appellant were not asserted before the PCRA court. Accordingly, they are waived." *Jacobs*, 727 A.2d at 549. Thus, we must turn our attention elsewhere to find a discussion of the waiver rule that was applied.

We find that the most relevant case to examine is *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998), which extensively discusses Pennsylvania's waiver rule. In *Albrecht*, the Pennsylvania Supreme Court noted that it had been its practice to relax waiver rules in capital cases. *Albrecht*, 720 A.2d at 700. That is, the court would entertain claims that were actually waived under the law. (With regard to this practice, the Third Circuit Court of Appeals has noted that the Pennsylvania Supreme Court "looks beyond" procedural waiver rules in death penalty cases. *Banks v. Horn*, 126 F.3d at 213 (3d Cir.1997)). The Pennsylvania relaxed waiver rule was created to prevent the court from being instrumental in an unconstitutional execution. *Albrecht*, 720 A.2d at 700 (Pa.1998).

However, the *Albrecht* court held that waiver must necessarily be recognized at some point in the criminal process in order that finality be eventually achieved, and to that end it decided that relaxed waiver would no longer be applied by the court in capital PCRA proceedings. *Id.* Although *Albrecht* is not specifically cited by the court in petitioner's Supreme Court opinion, it can be assumed the court applied this rule in deciding that several of the petitioner's claims were waived.

In considering whether this waiver rule was a firmly established and regularly followed state practice at the time it was applied in the instant case, we do not examine the law to ascertain if the rule was firmly established at the time it was applied, but at the time that the petitioner's alleged waiver occurred. *Id.* at 684, 720 A.2d 693. After a careful review, we find that the rule was not firmly established and regularly followed state practice at the time of Jacobs' alleged waiver.

This case is akin to the Third Circuit Court of Appeals case *Doctor v. Walters*, 96 F.3d 675 (3d Cir.1996). *Doctor* was a federal habeas corpus case dealing with a Pennsylvania Supreme Court opinion that quashed a defendant's appeal by applying a fugitive forfeiture law. Under the fugitive forfeiture law if a defendant became a fugitive, his appeal would be quashed, that is forfeited. In that case, the Pennsylvania Supreme Court used the rule to quash the defendant's appeal in 1993 even though the defendant became a fugitive several years earlier, in 1986. An issue in the subsequent federal habeas corpus action was whether the state court default was independent and adequate to foreclose federal review of the merits of the defendant's appeal.

The Third Circuit examined the case to determine the law with regard to fugitive forfeiture at the time that the defendant became a fugitive in 1986, not at the time the Supreme Court made its decision in 1993. After reviewing the law, the court

found that in 1986, the law that the Pennsylvania Supreme Court used to quash the defendant's appeal had not yet been firmly established. Therefore, the court had not relied on an "adequate" procedural rule to deny review of his appeal on the merits, and federal review of the merits of his claim was not precluded. *Id.* at 684–86.

Likewise, in the instant case, the relevant time to examine the waiver issue is not when the petitioner's Supreme Court decision was handed down, but rather at the time that the petition was filed and briefed. Relaxed waiver was the general rule when the petitioner filed and briefed his PCRA appeal. Jacobs' brief in support of his PCRA appeal before the Pennsylvania Supreme Court is dated January 30, 1998, and the reply brief is dated May 4, 1998. *See* Res.App. 18 and 19. The *Albrecht* opinion, dispensing with the relaxed waiver rule, was filed nearly eleven months later on November 23, 1998. We find, therefore, that the strict application of waiver principles was not firmly established and regularly followed state practice at the time of petitioner's PCRA appeal. Consequently, the strict waiver rule applied by the Pennsylvania Supreme Court is not an adequate and independent state procedural bar to federal court entertainment of constitutional claims, and we can appropriately address the merits of the petitioner's contentions.

The above analysis applies to claims that the Pennsylvania Supreme Court found were waived. We shall therefore address the merits of these claims, *infra*, where appropriate.[3]

■ As a preliminary matter, the respondents note that the instant habeas corpus petition is not in compliance with Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts. Rule 2(c) provides that the petition shall be signed under penalty of perjury by the petitioner. The original habeas corpus petition filed in this case was not signed by the petitioner. We find that the petitioner has remedied this defect by attaching a verification to his reply brief, verifying that the facts asserted in the habeas corpus petition are true. *See* Attachment "A" to Petitioner's Reply Memorandum in Support of Petition for a Writ of Habeas Corpus.

Many of petitioner's claims are raised in terms of in effectiveness of counsel. Accordingly, before discussing the merits of any of the issues, we will discuss the general law regarding ineffectiveness of counsel as set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### *Strickland*

A two-part test for judging ineffectiveness of counsel claims was developed in *Strickland.* First, the defendant must show that counsel's performance was deficient. This requirement involves demonstrating that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* at 687, 104 S.Ct. 2052; *Flamer v. State of Delaware,* 68 F.3d 710, 727–28 (3d Cir.1995) *cert. denied* 516 U.S. 1088, 116 S.Ct. 807, 133 L.Ed.2d 754 (1996). Proof must exist that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 728.

The second prong of the ineffectiveness of counsel claim that a habeas corpus petitioner must establish is that counsel's ineffectiveness was prejudicial. *Id.* at 728. The Supreme Court has held that "when a defendant challenges a death sentence..., the question is whether there is a reasonable probability that, absent the errors, the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104

---

3. These claims include the issues surrounding police testimony regarding cuts on the petitioner's arms and whether the prosecutor engaged in improper argument.

S.Ct. 2052, *quoted in Flamer*, 68 F.3d at 728.

We must be highly deferential to counsel's decisions as there is a strong presumption that counsel's performance was reasonable. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052. "The defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *U.S. v. Kauffman*, 109 F.3d 186, 189 (3d Cir.1997) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Moreover, the Third Circuit Court of Appeals has held that "[i]t is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *Id.* at 190 (quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir.1989)).

Bearing in mind this law with respect to ineffectiveness of counsel and the analytical framework that applies to habeas corpus cases, we now turn to the issues raised by the petitioner.

### 1. Mental health mitigating evidence

First, the petitioner alleges that trial counsel was ineffective for failing to investigate and present mental health mitigating evidence concerning the following: petitioner's cognitive and emotional impairments; and evidence that he suffers from the effects of a traumatic and neglectful childhood. The respondents contend that the Pennsylvania Supreme Court properly denied this claim.

Before examining the manner in which the Pennsylvania Supreme Court dealt with the instant issue, it is important to understand the sentencing procedure for first degree murder in Pennsylvania state court and to review the evidence that was not presented at the sentencing hearing.

### A. Sentencing procedure

After a first degree murder verdict is recorded and before the jury is discharged, the court conducts a separate sentencing hearing in which the jury determines whether the defendant shall be sentenced to death or life imprisonment. 42 Pa.C.S.A. § 9701(a). During the sentencing hearing, evidence is presented regarding aggravating circumstances (those circumstances favoring death) and mitigating circumstances (those circumstances favoring life imprisonment). The jury is then instructed that the verdict must be a sentence of death if it unanimously finds at least one aggravating circumstance and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances that outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases. 42 Pa.C.S.A. § 9711(c)(iv).

At Jacobs' sentencing hearing, the prosecution simply presented the evidence from the guilt phase of the trial. Res.App. 8, N.T. 9/18/92 at 833–34. The defense merely called one witness in addition to the petitioner.[4] The first witness was Delois Jacobs, the petitioner's mother, who testified about the petitioner's relationship with his younger sister; that he loved his daughter, Holly Jacobs; and that he was sorry that it had happened. *Id.* at 835–37.

The petitioner then testified to the following: he was twenty-one years old when the crime occurred; he felt remorseful; he attempted to cut his wrists after the killings; he had strong feelings for his daughter, even after her death; and he had a

---

4. At the PCRA hearing, trial counsel indicated that he had requested petitioner's uncle and aunt to be available for the sentencing hearing but apparently they were not. Counsel did not discuss at the PCRA hearing what information he had learned from them, or what attempts, if any, he had used to try to have them return for the sentencing hearing.

Res. Ex. 16, NT PCRA hearing, 5/29/97 at 45–46. Apparently, counsel made no effort to perform an investigation into the petitioner's past, besides speaking with these relatives who came to town for the trial. Whereas, the record reveals that there were many witnesses available willing to testify at the sentencing hearing.

good relationship with his five year old sister. *Id.* at 838–39.

After this brief testimony, the lawyers presented arguments on the aggravating and mitigating circumstances. The jury's verdict was a death sentence for the murder of Tammy Mock and life imprisonment for Holly Jacobs' death. As to Tammy Mock, the jury found the following aggravating circumstances: the offense was committed by means of torture; and the defendant was convicted of another murder committed either before or at the time of the offense at issue. The jury found the following to be mitigating factors: that the defendant was under an emotional disturbance; and his record. Ultimately, the jury concluded that the mitigating circumstances were outweighed by the aggravating circumstances and a death sentence was imposed for the murder of Tammy Mock.[5]

### B. The evidence

Petitioner now claims that powerful mitigation evidence was available. However, because trial counsel failed to investigate, he was not aware of it and did not present it at the sentencing hearing. A summary of what an investigation into the petitioner's background would have revealed follows:

Petitioner does not have a stable family background. Petitioner's mother was a heavy drinker and drank while she was pregnant with him. She was beaten by his alcoholic father in front of their children, including the petitioner. App. Ex. 4, Declaration/Affidavit of Marjorie Winston, ¶ 8. *See also* App. Ex. 5, Declaration/Affidavit of Hazel Jacobs Hinson, ¶ 10 and App. Ex. 6, Affidavit/Declaration of Lois Jacobs, ¶ 9. (Hereinafter "Ex. 4", "Ex. 5" and "Ex. 6" respectively).

Petitioner was afraid of his father because of the beatings he gave his mother. Ex. 4, ¶ 8; Ex. 5, ¶ 11. The beatings would sometimes leave her bloodied and bruised. Ex. 5, ¶ 11; App. Ex. 7, Declaration/Affidavit of Delois Jacobs, ¶ 2 (hereinafter "Ex. 7"). Eventually, petitioner's mother left her husband, and she and her children never saw him again. Accordingly, the petitioner never had any kind of real relationship with his father. *Id.;* Ex. 4 ¶ 8.

Moreover, petitioner's mother allowed him to drink in bars from a young age, and he began drinking at home by the age of twelve. His mother gave him money to buy beer. His aunt came to his house several times to find him, his mother and brother intoxicated. Ex. 4, ¶ 16.

After the breakup with petitioner's father, his mother became involved with a new boyfriend, Eugene. They were together for about ten years. Ex. 6, ¶ 11. Eugene started drinking and becoming intoxicated with petitioner when petitioner was thirteen years old. He would sometimes get into a rage and beat petitioner when they were both drunk. Ex. 4, ¶ 11.

Petitioner's mother would take him to the bars and give him drinks. She would also take him with her when she went to spend time on the street and when she met other men. *Id.* at ¶ 9; Ex. 5, ¶ 11. At times when the petitioner was "older" his mother would sometimes leave him with his aunt as a babysitter while she went out drinking. Despite his age, petitioner would cry when left. Ex. 4, ¶ 4. The mother would often return drunk the next morning to pick up the children. *Id.* at 10.

Additionally, petitioner's older brother constantly beat him and on one occasion stabbed him. Ex. 4, ¶ 15;Ex. 5, ¶ 13; Ex. 6, ¶ 14; Ex. 7, ¶ 4. When the stabbing occurred, the mother was visiting with a sister in Virginia. After being told of the stabbing, she did not cut short the visit to return home to attend to her son. Ex. 4, ¶ 15. She did not even go to the hospital to see Daniel. Ex. 6, ¶ 14. On several other occasions, petitioner's mother had to

---

**5.** As to the murder of Holly Jacobs, the jury found the mitigating factors outweighed the aggravating factors and a life sentence was imposed.

**402**

stop petitioner's brother from beating on him. Ex. 7, ¶ 4.

Petitioner attempted to get employment to help support his mother once her boyfriend left. However, he was not intelligent enough to fill out some of the applications and could not keep a job. Ex. 4, ¶ 13. He was not able to hold even the most simple jobs. Ex. 7, ¶ 7. Eventually, the mother found another boyfriend whom she met at a shelter. She started drinking more heavily, and the boyfriend began to abuse her and the petitioner. Ex. 4, ¶ 14. Petitioner was depressed because of his mother getting beaten and once again, the petitioner's mother left the boyfriend because she had been beaten so badly. *Id.*

In addition, petitioner also suffered from cognitive problems. He was always slow and confused. Ex. 5, ¶ 2. He would stare into space or at the television for hours. App. Ex. 9,. Declaration/Affidavit of Angie Jacobs, ¶¶ 2–3. At approximately six years of age, petitioner was involved in a car accident and a piece of metal from the radio went into his head and remained there. At the hospital, he went untreated for a long period of time, because his mother was not there and the hospital needed her permission to treat him. After this accident, he became afraid to go outside and seemed even slower mentally. Ex. 4, ¶ 6.

As a teenager, petitioner would sit around the house naked with uncombed hair staring at the television. *Id.* ¶ 5. His mother had to dress him and comb his hair and treat him like a little child. *Id.* His mother even bathed him as a young adult. Ex. 5, ¶ 5. Nonetheless, relatives would come to the house and find petitioner naked, or nearly so, dirty and unkempt sitting in front of the television *Id.* Even when he became a young adult he still acted like a child. His aunt would try to engage him in conversation, and all he would do was giggle and grin. Ex. 4, ¶¶ 3–4; Ex. 5, ¶ 2; Ex. 6, ¶¶ 2–4. His mother knew petitioner had problems but did not seek professional help—she merely kept him home. *Id.* at ¶ 9.

Moreover, medical witnesses could have testified to cognitive, mental and emotional problems suffered by the petitioner. Dr. Patricia Fleming, a licensed clinical psychologist and neuropsychologist, examined the petitioner at the request of post conviction counsel. She interviewed him and his mother and administered a psychological and neuropsychological test battery to him. App. Ex. 2, Affidavit/Declaration of Dr. Patricia Fleming, ¶ 3 (hereinafter "Ex. 2"). She concluded that the petitioner suffers from mild mental retardation with a full scale I.Q. of 63. *Id.* at ¶ 9. She also found that organic brain damage was suggested and consistent with his background of apparent prenatal maternal alcohol abuse, head traumas ·and exposure to physical abuse and neglect. *Id.* She further concluded that the petitioner suffers from serious psychological and emotional impairments including schizoid personality disorder [6] which causes significant functional impairment and distress. *Id.* at ¶ 11. Dr. Fleming came to the conclusion that the petitioner's traumatic childhood, mental retardation, organic brain damage, emotional impairments and personality disorder cause significant psychological, emotional and cognitive impairments. *Id.* at ¶ 12.

Julie Kessel, M.D., a practicing psychiatrist, Board Certified by the American Board of Psychiatry and Neurology, conducted a forensic psychiatric evaluation of the petitioner. She likewise found him to be mentally retarded with an I.Q. below 70. App. Ex. 3, Declaration of Julie Kes-

---

**6.** Schizoid personality disorder is marked by extreme withdrawal and isolation, such that the sufferer forms very few attachments outside of his immediate family and is socially and emotionally impoverished. Other features of the disorder are paranoid thinking and the experience of altered auditory perceptions. People with this disorder have great difficulty functioning, especially socially, have few interests and attachments and a flattened affect. App. Ex. 3, Declaration of Julie Kessel, M.D., ¶ 7.

sel, M.D., ¶ 3 (hereinafter "Ex. 3"). She also concluded that for most of his life petitioner has suffered from extreme mental and emotional disturbance, including mental retardation, brain damage and schizoid personality disorder. In addition he has suffered from the effects of childhood abuse, alcohol and drug abuse,[7] trauma and neglect. *Id.* at ¶ 13. Further, he has suffered from dysthymia since his teenage years which is characterized by a chronic depressed mood, impairments in appetite and sleep, lack of energy, low self-esteem and difficulty concentrating and making decisions. *Id.* ¶ 8.

The sole doctor to examine the petitioner prior to the trial was Dr. Robert Davis, a medical doctor and psychiatrist with a clinical and forensic practice in Harrisburg, Pennsylvania. He was not informed that the prosecution was seeking the death penalty. Moreover, he was not asked to conduct an evaluation with respect to any possible mental health-related mitigating circumstances but was asked only to conduct an evaluation concerning any mental health issues regarding the petitioner's criminal responsibility (insanity or some form of diminished capacity) and competency to stand trial. App. Ex. 1, Affidavit/Declaration of Dr. Robert Davis ¶ 1–2 (hereinafter "Ex. 1"). He was not provided with any materials concerning petitioner's background. *Id.* at ¶ 3. Dr. Davis states:

> As is well understood among forensic mental health professionals, the scope of an evaluation for purposes of mitigation at a capital sentencing proceeding is far broader than that for competency or criminal responsibility at trial. Mental, cognitive and emotional impairments and disturbances that do not render a person incompetent or insane are nevertheless highly relevant for purposes of mitigation. In addition, collateral information concerning the individual's background and life history, including medical and other records, childhood abuse and/or neglect, history of drug or alcohol abuse, and accounts of the individual's life, background and development from people who knew him as a child, teenager or adult, are particularly important for purposes of mitigation. Furthermore, to the extent there is any indication of possible organic impairment, psychological and neuropsychological testing is indicated in capital cases. In fact, my practice in capital cases is to request such testing to screen for brain damage or other impairments not immediately seen upon a standard psychiatric evaluation.

*Id.* at ¶ 6.

Dr. Davis states that had he been provided with the necessary collateral information in the instant case he could have provided a report and testimony concerning the harmful effects of abuse and neglect on children, the global impairments suffered by those who are mentally retarded, the significance of organic brain damage, the impairments resulting from schizoid personality disorder and the exacerbating effects on all of these impairments by the abuse of alcohol and drugs. Ex. 1, ¶ 11.

Jacobs presents this evidence to establish that mitigating evidence exists that may have influenced the jury to agree upon a lesser sentence. We have expanded the record to include the affidavits/declarations referenced above that were submitted by the petitioner. *See* Rule No. 6 of the Rules Governing Habeas Corpus Proceedings under Section 2254. Respondents indicated that they do not oppose the expansion. *See* Doc. 26. *See Blackledge v. Allison*, 431 U.S. 63, 81, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) (explaining that the court may direct expansion of the record to include any appropriate material that will enable the judge to dispose of some

---

**7.** Dr. Kessel indicates that petitioner was exposed to cocaine, marijuana and LSD by four- teen years of age. Ex. 3, ¶ 11.

habeas petitions that are not dismissed on the pleadings, without the time and expense required for an evidentiary hearing). Accordingly, we find that this evidence was available and could have been presented to the jury during the penalty phase.[8]

No doubt exists but that such evidence as has been presented by petitioner would count as mitigating. Pennsylvania statutory law provides for the following two mitigating factors: "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa.C.S.A. § 9711(e)(3); and "The defendant was under the influence of extreme mental or emotional disturbance." 42 Pa.C.S.A. § 9711(e)(2).

### C. Pennsylvania Supreme Court analysis

In its PCRA opinion, the Pennsylvania Supreme Court addressed trial counsel's alleged failure to investigate mitigating evidence and found that trial counsel was not ineffective. The court concluded that trial counsel had a reasonable basis for his course of conduct. This conclusion was based upon the following: there was no evidence that counsel was aware of Jacobs' mental problems; all the mental health evidence that trial counsel had obtained indicated that the petitioner was not mentally incapacitated; petitioner's mental state was in fact raised as a mitigating factor; and the jury found a mitigating factor in that the petitioner was under extreme mental and emotional disturbance. *Commonwealth v. Jacobs,* 727 A.2d at 551.

To address the merits of the petitioner's habeas corpus claim with regard to the Pennsylvania court's ruling, we must determine, as set forth *supra,* whether: 1) the petitioner has demonstrated that United States Supreme Court precedent requires an outcome contrary to that

reached by the state court; or 2) the state court decision represents an unreasonable application of Supreme Court precedent. That is, the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified. *Matteo,* 171 F.3d at 891.

It is beyond question that clearly established federal law, as determined by the United States Supreme Court, exists and is applicable to the instant case. The law is the previously explained *Strickland* case which deals with ineffectiveness of counsel. *See Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Our task is to determine whether the Pennsylvania Supreme Court's rejection of the petitioner's claim is contrary to or involved an unreasonable application of this established law. *Id.*

Pennsylvania's courts apply a standard for ineffectiveness of counsel that is identical to the standard set forth by the United States Supreme Court in *Strickland.* Therefore, the Pennsylvania Supreme Court's ruling was not contrary to established United States Supreme Court precedent. *Werts v. Vaughn,* 228 F.3d 178, 203–04 (3d Cir.2000). Hence, we must proceed to determine if the Pennsylvania Supreme Court's decision represents an unreasonable application of federal court precedent. In other words, we must determine whether the state court opinion, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified.

As explained more fully *supra, Strickland* requires a two step analysis. A court must first examine whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and if so, whether petitioner was prejudiced by counsel's substandard performance. While addressing this issue, we bear in mind that "[t]he

---

**8.** We could have considered the evidence without "expanding the record" as it was part of the state record and examined by the state court. *See Jacobs,* 727 A.2d at 550. Nevertheless, we have utilized the expansion process and provided the respondents an opportunity to address the petitioner's evidence.

basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state, and to present mitigating evidence." *Starr v. Lockhart,* 23 F.3d 1280, 1285 (8th Cir.1994) *cert. denied sub nom Norris v. Starr,* 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994). Trial counsel even admitted at the PCRA hearing that he was concerned because he believed there was "a real risk" of a first degree murder conviction. Res. Ex. 16, N.T. PCRA hearing 5/29/97 at 46.

### D. *Strickland*'s first prong, deficient performance

■ Petitioner claims that his trial counsel was ineffective for failing to investigate and present mitigating evidence. To begin its analysis, the Pennsylvania Supreme Court noted that trial counsel did conduct an investigation into the petitioner's mental state. As noted above, trial counsel had the petitioner examined by Dr. Robert Davis, a psychiatrist, to determine whether the petitioner suffered from a mental impairment that would have negated his criminal responsibility or rendered him incompetent to stand trial. Dr. Davis determined that the petitioner did not suffer from any such impairment and that he was competent to stand trial.[9] *Jacobs,* 727 A.2d at 550–51.

At issue, currently, however, is whether an evaluation was performed with regard to *mitigating* evidence not whether the petitioner suffered a mental impairment that would have affected his criminal responsibility or competency to stand trial. As set forth above, Dr. Davis states that an evaluation for mitigating evidence is different from an evaluation for criminal responsibility/competency to stand trial. He was asked only to perform the latter, and was not informed that the prosecution was seeking the death penalty.

Moreover, the Pennsylvania Supreme Court misconstrued the affidavit/declaration of the examining psychiatrist. The court concluded that "[Dr. Davis] notes, however, that collateral information regarding [petitioner's] upbringing would have been required for him to conclude that further testing was necessary." *Id.* at 750, 727 A.2d 545. In support of this conclusion, the court cites paragraphs 6, 8, 10 and 11 of Dr. Davis's affidavit. *Id.* A review of the affidavit/declaration, including these paragraphs, reveals that the Supreme Court is incorrect.

Dr. Davis was not informed by trial counsel that this was a capital case. In capital cases, it is Dr. Davis's practice to request testing to screen for brain damage or other impairments not readily seen upon a standard psychiatric evaluation. Pet.App. 1, Affidavit/Declaration of Dr. Robert Davis, ¶ 6. No further collateral evidence was necessary to trigger such testing. Dr. Davis simply had to know that the prosecution was seeking the death penalty. He further opined that had he been' provided with the relevant background evidence and requested to conduct a mitigation evaluation he "would definitely have requested psychological testing. *Even without this collateral information,* had I been asked to conduct a mental health mitigation evaluation, I would have requested psychological testing." (emphasis added). *Id.* at ¶ 8. Dr. Davis did not need information that was not within the attorney's knowledge to conclude that further testing was needed. All he needed was to know that it was a capital case and/or a request to perform a mitigation evaluation. Therefore, we find that the Pennsylvania Supreme Court erred in its analysis.

Moreover, even if we were to accept the Pennsylvania Supreme Court's reasoning that Dr. Davis needed more information to conclude that further testing was necessary, their opinion would still be flawed. The court found that trial counsel was not

---

9. Dr. Davis did not prepare a written report for the matter, but merely informed trial counsel orally of his conclusion. Res.App. 16, N.T. PCRA hearing 5/29/97 at 31.

ineffective for failing to explore the mitigating evidence because he did not have the relevant background information on the petitioner that Dr. Davis would have needed to perform a mitigation evaluation. The court stated that "the record, however, fails to reveal that trial counsel was aware of the circumstances surrounding [Jacobs'] upbringing. Nor does [Jacobs] assert that counsel was aware of these matters." *Jacobs*, 727 A.2d at 551. The court reasoned that because counsel did not possess the information, he was not ineffective in failing to have the mitigation evaluation performed.

The Pennsylvania Supreme Court's reasoning represents an unreasonable application of United States Supreme Court precedent. The important point is not that counsel did not have the information, but rather, we must examine *why* counsel did not have the information. Here, counsel did not have the information because he failed to investigate and obtain the relevant information. The fact that trial counsel did not have such information merely supports the conclusion that he did not fully investigate—it does not justify the failure to investigate and present evidence as the Pennsylvania Supreme Court held.

United States Supreme Court precedent holds that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. Moreover, the duty to investigate encompasses an investigation into mitigating circumstances including family background and mental health mitigating evidence. "To descend to the level of ineffective assistance of counsel, a lawyer's performance must be poor indeed...[A]t the penalty phase of a capital case, a failure to investigate or to adequately prepare expert witnesses may sink to that level." *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir.1999) *cert. denied* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000).

The United States Supreme Court has cited with approval the *ABA Standards for Criminal Justice* for the proposition that trial counsel has an obligation to conduct a thorough investigation of the defendant's background for the sentencing phase of a trial. *Williams*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Pursuant to the *ABA Standards for Criminal Justice:*

> The lawyer ... has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions....

*1 ABA Standards for Criminal Justice*, 4–4.1, commentary, p. 4–55 (2d ed.1980).

One of the underpinnings of this facet of the law is that under United States Supreme Court precedent, the major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the defendant. *See Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). In addition, the United States Supreme Court has recognized the principle that "punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no

such excuse." (internal quotation omitted) *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

It is not surprising then that many circuit courts of appeals cases from various circuits have found counsel ineffective for failing to investigate and present evidence of family history, character, background and mental deficiencies. *See Glenn v. Tate,* 71 F.3d 1204 (6th Cir.1995) *cert. denied* 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996) (counsel ineffective for failing to present evidence of mental history and family background where evidence was submitted that the crime was not the product of mental retardation or organic brain disease); *Brewer v. Aiken,* 935 F.2d 850, 857–58 (7th Cir.1991) (defense counsel's lack of investigation into mental and family history of a defendant with low intelligence was ineffective assistance of counsel); *Antwine v. Delo,* 54 F.3d 1357, 1367 (8th Cir.1995) *cert. denied sub nom Bowersox v. Antwine,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996) (defense counsel has a duty to investigate possible mental health mitigation evidence); *Wallace v. Stewart,* 184 F.3d at 1115–18 (9th Cir.1999) (counsel has duty to investigate background information and bring it to the attention of experts); *Armstrong v. Dugger,* 833 F.2d 1430, 1433–34 (11th Cir.1987) (trial counsel ineffective for failure to discover available mitigating evidence regarding petitioner's mental retardation and organic brain damage).

Moreover, the Third Circuit Court of Appeals has held that "[w]hile counsel is entitled to substantial deference with respect to strategic judgment, an attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation." *United States v. Kauffman,* 109 F.3d at 190.

The Third Circuit Court of Appeals has likewise indicated that a failure to produce mitigating evidence can be ineffective assistance of counsel. The court held that counsel is not ineffective for holding back such information, if it is held back for a tactical reason. *Deputy v. Taylor,* 19 F.3d 1485, 1494 (3d Cir.1994) *cert. denied* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994). In *Deputy,* defense counsel did not investigate within the defendant's family, the mitigating effect of his traumatic childhood and his alcohol dependence. Instead, he had decided to focus in the penalty phase on the fact that the defendant had been changed by a religious conversion. *Id.* at 1493–94. Because a tactical reason existed for the failure to present the mitigation evidence to the jury, trial counsel was deemed effective. *Id.* If it is effective assistance of counsel to fail to investigate and present such evidence when a tactical reason exists for such a failure, then by implication, it is ineffective assistance of counsel to fail to investigate and present such evidence when no tactical reason exists for such failure.

Likewise in *Riley v. Taylor,* 237 F.3d 300, 2001 WL 43597, the Third Circuit Court of Appeals examined the issue of ineffective assistance of counsel and its application to background information and mental examinations. In that case, counsel was found to have acted within the bounds of effectiveness where he failed to introduce background information at the penalty phase. However, he had a strategic reason for doing so, and his client did not want his family background discussed at the penalty phase. *Id.* at 326–327. Moreover, a mental examination was not warranted because the attorney had no reason to think that one would be helpful. *Id.* at 327. In the instant case, an investigation into the petitioner's background certainly would have indicated that further psychological/mental testing was appropriate.

The instant case is analogous to the case of *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) where the United States Supreme Court applied *Strickland* and found deficient performance of counsel for failing to fulfill the obligation to conduct a thorough investiga-

tion of the defendant's background. In *Williams,* counsel failed to investigate and present, *inter alia,* the following evidence in a capital sentencing phase: extensive records graphically describing the defendant's nightmarish childhood; that defendant was borderline mentally retarded and did not advance beyond the sixth grade in school; prison records commending the defendant for helping to crack a prison drug ring and for returning a guard's missing wallet; or testimony of prison officials who described the defendant as least likely to act in a violent, dangerous or provocative way. *Id.* at 396, 120 S.Ct. 1495.

Accordingly, we find that the great weight of federal law requires defense counsel in a capital case to investigate a defendant's background, cognitive status and mental health for mitigating evidence. The federal law that leads us to this conclusion has been dictated by the United States Supreme Court and the circuit courts of appeals including the Third Circuit Court of Appeals. In the instant case, trial counsel did not perform an adequate investigation and much relevant evidence was left undiscovered and not presented to the jury. Consequently, we conclude that trial counsel's performance was deficient.

### E. *Strickland's* second prong—prejudice

Secondly, under *Strickland,* we must determine whether the petitioner was prejudiced due to counsel's deficient performance. *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. To establish prejudice, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

■ In the instant case, petitioner's background history of abuse and/or the reality that he was mentally retarded and

suffered from other cognitive and psychological problems might well have influenced the jury's appraisal of his moral culpability. *Id.* at 398, 120 S.Ct. 1495. As summarized by the Sixth Circuit Court of Appeals many circuits have found prejudice in similar situations:

> Our sister circuits have had no difficulty in finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity. ... [S]ee, e.g., Stephens v. Kemp, 846 F.2d 642, 652–55 (11th Cir.), cert. denied, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) ("the resulting prejudice is clear"); Blanco v. Singletary, 943 F.2d [1477, 1505 (11th Cir.), cert. denied, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) ](prejudice requirement "clearly met" by counsel's failure to present evidence of epileptic seizures and organic brain damage); Loyd v. Whitley, 977 F.2d 149, 159–60 (5th Cir. 1992), cert. denied, 508 U.S. 911, 113 S.Ct. 2343, 124 L.Ed.2d 253 (1993) (failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"). We would be badly out of step with the other circuits were we to conclude that there was no prejudice in the case at bar.

*Glenn v. Tate,* 71 F.3d at 1211.

In addition to these cases, the Sixth Circuit also cited *Brewer,* 935 F.2d at 858–59 in which the Seventh Circuit Court of Appeals found prejudice where counsel failed to provide the jury with evidence of the defendant's "entire history—troubled childhood, low I.Q., deprived background, and myriad of other psychiatric problems". In addition, the Eighth Circuit Court of Appeals has found prejudice where counsel was ineffective in failing to present evidence of the defendant's mental impairment at the penalty phase. *Antwine,* 54 F.3d at 1371. In *Antwine,* as in the instant case, the jury was required to find

unanimously that death was warranted. More mitigating circumstances would have upset the balance of mitigating and aggravating circumstances sufficiently to create a reasonable probability that death would not have been imposed. *Id.*

Viewing the record as a whole, including the mitigating and aggravating factors addressed at the trial and those that were not addressed due to counsel's failure to investigate, we find a reasonable probability that the result in the sentencing would have been different had competent counsel presented and explained the significance of all the available evidence. The Pennsylvania Supreme Court's decision involved an unreasonable application of established federal law with regard to trial counsel's failure to investigate. Accordingly, the petitioner's constitutional right to effective assistance of counsel as defined in *Strickland, supra,* was violated, and the imposition of the death penalty would be unconstitutional under the Sixth and Fourteenth Amendments.

In cases where deficient performance and prejudice is found, the courts conditionally grant the writ of habeas corpus pending re-sentencing by the state court. *See Brewer,* 935 F.2d at 859; *Glenn,* 71 F.3d at 1211; *Antwine v. Delo,* 54 F.3d at 1371; *Kenley v. Armontrout,* 937 F.2d 1298, 1309–10 (8th Cir.1991) *cert. denied sub nom Delo v. Kenley,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). Accordingly, we shall order likewise.

**2. Voir dire and venue**

Petitioner's next claim for relief is that he was denied his right to a fair trial where the trial court and trial counsel failed to ensure through voir dire that he would be tried by a fair and impartial jury, and where trial counsel failed to request a change of venue despite highly prejudicial pretrial publicity. As this claim includes two subjects, voir dire and venue, we shall address them separately.

**A. Voir dire**

With respect to voir dire, the petitioner raises two arguments. First, he claims it was an error of both his trial counsel and the court to fail to ask any of the jurors questions about racial prejudice. This was a case of a black man being tried for the deaths of his white girl friend and their child. Secondly, he claims it was an error for the trial court to fail to "life qualify" the jury—that is ask them if they could vote for life imprisonment as opposed to automatically imposing the death penalty. We shall address all these issues *seriatim.*

**1. Racial prejudice questions and voir dire**

In this claim, petitioner complains that neither the court nor trial counsel asked any questions of the jury with regard to racial prejudice. The law provides that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. *Turner v. Murray,* 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). However, where trial counsel fails to request voir dire on the subject of racial prejudice, the trial judge is not required to approach the topic *sua sponte. Id.* The question we are presented with is whether counsel was ineffective for failing to request voir dire on the issue of racial prejudice in the instant case where the defendant was black and was accused of killing his white girl friend and their child.[10]

Although the issue of racial bias of the jury involves interesting constitutional questions, we need not address it. Petitioner raises this issue in the context of

---

10. The Pennsylvania Supreme Court has distinguished the Commonwealth's sentencing statute from that in *Turner* and found that the mere fact of racial disparity between the perpetrator and the victim, in and of itself, is insufficient to require questioning regarding racial bias. Rather, special circumstances must be present in the case that make it racially sensitive. *Commonwealth v. Marrero,* 546 Pa. 596, 687 A.2d 1102, 1108 (1996).

challenging his sentence of death, not the underlying conviction. He states, "[t]he unreliability inherent in a *death sentence* imposed by an all-white jury against an African–American in an interracial crime, when that jury has not been questioned about racial bias, is intolerable under the Eighth Amendment." (emphasis added) Pet. at ¶ 45, Pet. Reply Memo. at 49. Further, the Supreme Court opinion on which petitioner relies also deals with the unreliability of the sentence, rather than the conviction. *See Turner v. Murray, supra.* We have in the prior section already determined that the petitioner's death sentence is improper. Consequently, we need not address the merits of this issue.

### 2. Life qualifying the jury

Petitioner's next claim is that counsel was ineffective in failing to question jurors as to whether they would automatically vote for death if petitioner were convicted of first degree murder. That is, petitioner claims that he had the right to conduct voir dire to exclude for cause jurors who could not return a life sentence or give independent effect to relevant mitigating evidence, which is known as "life qualifying" the jury. The United States Supreme Court has held that the Constitution requires that inquiry be made into whether the views of prospective jurors on the death penalty disqualify them from sitting. *Morgan v. Illinois,* 504 U.S. 719, 733–34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

Once again, however, this issue pertains to the sentencing phase of the trial which we have already ruled on in favor of the petitioner. *See id.* at 739 n. 11, 112 S.Ct. 2222 (1992) (the Supreme Court's decision regarding the necessity of life qualifying the jury had no bearing on the validity of the petitioner's conviction). Accordingly, we need not address this issue, and it will be dismissed as moot.

### B. Venue

According to the petitioner, trial counsel was ineffective for failing to seek a change in venue. Petitioner contends that media coverage of the deaths at issue was so highly prejudicial and inflammatory that it is unlikely that petitioner could receive a fair trial from jurors who had been exposed to it. The coverage about which the petitioner complains includes a newspaper account of the death of Tammy Mock and Holly Jacobs which contained allegations that he (petitioner) had made previous threats against Mock. No evidence was introduced at trial of these alleged prior threats. In addition, a front page newspaper photograph depicted the petitioner sticking his tongue out at photographers. Pet. ¶¶ 52–53, Petitioner's Appendix (hereinafter "Pet.App.") 11, 12.

The Pennsylvania Supreme Court has ruled on Jacobs' claim. In its opinion on petitioner's PCRA appeal, the court ruled that trial counsel was not ineffective in failing to seek a change in venue because jurors were questioned about possible bias during voir dire and challenges for cause were made based upon their responses. *Jacobs,* 727 A.2d at 548.

Petitioner claims it was improper for the Pennsylvania Supreme Court to base its decision on the fact that the jurors were questioned in voir dire and strikes for cause were granted, because the pretrial publicity was so inflammatory that prejudice is inherent or can be presumed. We disagree.

The law provides that where pretrial publicity is particularly inflammatory and saturates the community in which the trial is held, a change of venue is appropriate. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In addition, inherent prejudice can be found where an unacceptable risk is presented of impermissible factors coming into play regardless of whether the jurors actually articulated a consciousness of a prejudicial effect. *Holbrook v. Flynn,* 475 U.S. 560, 571, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

■ We cannot find that the pretrial publicity in the instant case gives rise to inherent prejudice or justifies a change in venue. In *Rideau, supra,* the Supreme Court found it improper to refuse to change venue where a film of the defendant confessing in detail to the sheriff was televised three times to tens of thousands of potential jurors. *Id.* Moreover, three members of the jury who convicted the defendant stated on voir dire that they had seen and heard the confession. *Id.* at 725, 83 S.Ct. 1417.

Petitioner has not alleged that the pretrial publicity was as inflammatory as that in *Rideau.* This case is more akin to the case of *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), where prejudice was not presumed. The Supreme Court acknowledged that prejudice can be presumed where the influence of the news media, either in the community at large or in the courtroom itself, pervaded the trial proceedings. *Id.* at 799, 95 S.Ct. 2031.

The court explained several cases where prejudice was presumed as follows:

> The trial in *Estes [v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) ]had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard [v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ] arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime

with which he is charged alone presumptively deprives the defendant of due process.

*Murphy,* 421 U.S. at 800, 95 S.Ct. 2031.

In *Murphy,* the jurors were exposed, through the news media, to information about a defendant's prior conviction and general news accounts of the crime with which he was charged. This information did not rise to the level of presumptive prejudice. *Id.* Likewise, we find that in the instant case, the facts, as alleged by the petitioner, simply do not rise to the level of presumed prejudice. The coverage of which the petitioner complains includes a newspaper account of the death of Tammy Mock and Holly Jacobs which contained allegations and headlines that he (petitioner) had made previous threats against Mock. In addition, a front page newspaper photograph depicted the petitioner sticking his tongue out at photographers. The two items ran in February 1992. Pet.App. 11, 12. The petitioner was not tried until September 1992. Petitioner raises its change of venue argument based solely upon these two newspaper items from seven months before the trial. These allegations are not nearly as inflammatory as a televised confession as in *Rideau* and do not indicate that the influence of the news media pervaded the proceeding either inside or outside the courtroom Accordingly, we cannot find that trial counsel's performance was deficient under *Strickland, supra,* with regard to failing to ask for a change of venue, and the petitioner's claim of ineffectiveness will be denied.

### 3. Diminished capacity defense

Next, the petitioner avers that trial counsel was ineffective for failing to adequately investigate and present evidence supporting the diminished capacity defense. Further, he contends that trial counsel was ineffective by not requesting a jury instruction on diminished capacity. For the reasons that follow, the petitioner's claims will be denied.

Under United States Supreme Court precedent, counsel has a duty to perform reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary. *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. 2052. We must apply a "heavy measure" of deference to counsel's judgments. *Id.*

In the instant case, petitioner claims that trial counsel did not perform an adequate investigation to support a diminished capacity defense. Trial counsel had the petitioner evaluated by a psychiatrist who indicated that he did not suffer from any major mental illness or impairment that would render him incompetent to stand trial or that would negate or reduce his criminal responsibility. Pet.App. 1, Affidavit/Declaration of Dr. Robert Davis at ¶ 4.

Petitioner complains that trial counsel performed no independent investigation of the background facts necessary for the examining psychiatrist to arrive at a reliable assessment of Jacobs' mental state at the time of the offense. According to the petitioner, if counsel had interviewed his relatives, he would have learned the following: Jacobs was universally considered "slow"; he had never been able to hold a job or function independently as an adult; his mother drank heavily while she was pregnant with him; he was exposed to lead paint; and he experienced significant head trauma. His medical records would have provided more evidence of head trauma. Pet. ¶ 60.

Based on this background information, petitioner alleges that defense counsel would have known that further psychological and neuropsychological testing was necessary. *Id.* Petitioner presents affidavits to establish that additional testing has revealed that his impairments diminish his capacity to premeditate, thus furthering a diminished capacity defense for first degree murder. Pet.App. 2, Aff. Dr. Patricia Fleming; Pet.App. 3, Aff. Julie Kessel. In addition, petitioner complains that counsel did not request an instruction on diminished capacity.

The Pennsylvania Supreme Court ruled as follows:

> Based on the results of the psychiatric evaluation, and given Appellant's trial testimony, it is clear that trial counsel did investigate and pursue a diminished capacity defense on behalf of Appellant to the best of his ability. Accordingly, as trial counsel had a reasonable basis for proceeding as he did, he cannot be deemed ineffective.

*Jacobs,* 727 A.2d at 549.

We are in agreement with the Pennsylvania Supreme Court. However, petitioner cites the following cases to support his position that counsel must independently investigate the background of a defendant and present that evidence to the psychiatric evaluator: *Glenn v. Tate,* 71 F.3d 1204 (6th Cir.1995) *cert. denied* 519 U.S. 910, 117 S.Ct. 273, 136 L.Ed.2d 196 (1996); *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.1991) *cert. denied sub nom Delo v. Kenley,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991); *Antwine v. Delo,* 54 F.3d 1357 (8th Cir.1995) *cert. denied sub nom Bowersox v. Antwine,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996); *Clabourne v. Lewis,* 64 F.3d 1373 (9th Cir.1995); and *Wallace v. Stewart,* 184 F.3d 1112 (9th Cir.1999) *cert. denied* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000). These cases support the contention that a background investigation must be made, however, they deal with the penalty phase of the trial, not the guilt phase. We have already discussed, *supra,* the penalty phase of the case. Now the petitioner is claiming ineffectiveness of trial in the guilt phase of the trial.

Several circuit courts of appeal have held that for purposes of the guilt phase of the trial, it is not ineffective assistance of counsel to fail to perform a mental history background investigation unless the psychiatric evaluator indicates that such information is needed. The duty to seek out additional information is only triggered where the doctor feels incapable of basing

his conclusion on the information he generates through his own testing and examination. *See Hendricks v. Calderon,* 70 F.3d 1032, 1038 (9th Cir.1995) *cert. denied* 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996); and *Card v. Dugger,* 911 F.2d 1494, 1512 (11th Cir.1990). We find the reasoning of these courts to be cogent.

In the instant case, the petitioner was evaluated by a psychiatrist. According to trial counsel's testimony at the PCRA hearing, the petitioner was at first reluctant to be evaluated, claiming that he was perfectly sane. Counsel had to convince him to talk to a psychiatrist. He finally agreed and a petition was filed seeking to have a psychiatrist appointed. Res.App. 16, N.T. PCRA hearing at 30. Dr. Robert Davis examined the petitioner and indicated that he did not suffer from any major mental illness or impairment that would render him incompetent to stand trial or that would negate or reduce his criminal responsibility. *Id.* at 31; Pet. App. 1, Affidavit/Declaration of Dr. Robert Davis at ¶ 4.

Petitioner has presented no evidence that Dr. Davis felt incapable of basing his conclusions on the information he possessed. The record reveals no request for additional information. Accordingly, we find that the petitioner's ineffectiveness of counsel claim with regard to failure to investigate a diminished capacity defense is without merit, and it shall be denied.

This case is different from *Commonwealth v. Legg,* 551 Pa. 437, 711 A.2d 430 (1998) which is cited by the petitioner. In *Legg,* counsel was found to be ineffective for failure to investigate where he had sufficient indicia of the defendant's prearrest mental disorder to warrant further investigation. *Id.* at 434. In the instant case, no evidence has been presented that counsel had any indicia of a disorder on the petitioner's part that would have triggered his duty to investigate for purposes of the guilt phase of the trial.

In a similar vein, and in the same section of his brief and petition, the petitioner claims that counsel was ineffective for failing to request a jury charge on diminished capacity. We disagree. The defense argued that the petitioner had not formed a specific intent to kill. (This defense is discussed more fully below). The court did charge on the elements of murder and what was required for each to be found (Res.App. 8, N.T. 9/18/92 at 800–813) including a discussion on sudden and intense passion resulting from provocation by the victim. *Id.* at 808–810. Accordingly, we find no merit in petitioner's claim of ineffectiveness as trial counsel's performance was not deficient under *Strickland, supra.*

**4. Impeachment of the petitioner's mother**

Petitioner next claims that he was denied his right to effective assistance of counsel because trial counsel did not properly investigate and impeach the testimony of the petitioner's mother, Delois Jacobs, who testified concerning admissions that he made to her. Petitioner alleges that she should have been impeached with evidence that she had a long history of alcoholism and may have been intoxicated when the admissions were made.

More particularly, petitioner's mother, Delois Jacobs, testified at the trial that the petitioner had telephoned her shortly after the deaths and confessed to her that he had killed Tammy Mock. Res.App. 6, N.T. 9/16/92 at 544. She said that she was very upset at the time and was not quite sure what the petitioner said about the other victim, Holly Jacobs. *Id.* at 545. The prosecution confronted her with her testimony from the preliminary hearing where she had testified that petitioner had told her that he had killed both Tammy Mock and Holly Jacobs. *Id.* at 549–550. Delois Jacobs tried to explain the discrepancy by stating that she was upset at the time petitioner confessed to her and she may have been wrong regarding the killing of Holly Jacobs. *Id.* at 550–51. On cross-

examination by defense counsel, she indicated that the petitioner may merely have stated that Holly Jacobs was dead, not that he had killed her. *Id.* at 563. At the trial, the petitioner admitted killing Tammy Mock but denied murdering the baby, Holly Jacobs. He claimed that Tammy Mock had killed Holly Jacobs which provoked him into killing Mock. Res.App. 7, N.T. 9/17/92 at 685–688.

Petitioner avers that adequate investigation would have revealed that the witness suffered from an alcohol problem and that trial counsel could have impeached her testimony. We are unconvinced. Petitioner argues that the defense's position at trial was as follows: Delois Jacobs' trial testimony was accurate and she had previously either not clearly understood, or not clearly recalled, exactly what petitioner had said during the conversation regarding the death of Holly Jacobs. According to the petitioner, this position is far more credible if testimony was presented that she was a chronic alcoholic who was drinking at the time of the conversations in question. We do not find this argument to be cogent because impeaching her with questions about alcohol would have adversely affected her credibility with regard to the trial testimony that was favorable to the petitioner.

In order to support a claim of ineffectiveness of counsel, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *U.S. v. Kauffman,* 109 F.3d 186, 189 (3d Cir.1997). With regard to the instant issue, the petitioner has failed to overcome this presumption.

At the PCRA hearing, trial counsel testified that because the trial testimony of the petitioner's mother was consistent with petitioner's own testimony, it was important that her current version and recollection of her conversations with the petitioner be viewed as accurate by the jury. Therefore, he did not vigorously cross-examine her. Res.App. 16, N.T. PCRA hearing,

5/29/97 at 38–39. Trial counsel's reasoning is convincing. Delois Jacobs' trial testimony supported petitioner's defense. She refused to testify that petitioner had told her that he had killed Holly Jacobs. Petitioner apparently would have preferred trial counsel to have argued: The witness was drinking during the conversations and an alcoholic. Therefore, her testimony at the preliminary hearing was unreliable, but her testimony at trial is believable. Petitioner's position is without merit.

If the alcohol issues rendered the witness's preliminary hearing testimony unworthy of belief, the trial testimony would also be suspect. Accordingly, impeaching the witness with evidence that she was an alcoholic and may have been imbibing alcohol when the telephone conversations took place would have been a poor trial tactic and would not have altered the jury's verdict of guilty. Trial counsel's actions, therefore, were sound trial strategy and not ineffective assistance of counsel. Petitioner's claim, therefore, will be denied.

## 5. Opinion testimony from a police officer

■ Next, petitioner claims that he was denied a fair trial when the trial court permitted lay opinion testimony from a police officer. Further, he claims trial counsel was ineffective for not objecting to the testimony and appeal counsel was ineffective for not raising the issue on appeal. We disagree.

First, we will discuss the testimony at issue. Detective Dennis Williams, a Commonwealth witness, testified that he observed a large number of cuts on the petitioner's arms and wrists when he questioned him and that they appeared to be self-inflicted. Res.App. 6, N.T. 9/16/92 at 462. No objection was made at the trial to the testimony. Petitioner claims that Williams was not an expert witness on this issue and should not have been allowed to provide his lay opinion. Peti-

tioner claims that allowing the testimony violated his due process rights.

The testimony is important to the petitioner because he claims it contradicts his own testimony. At trial, the petitioner testified that one of the victims, Tammy Mock, had attacked him with a knife and cut him on the hand before he was able to remove the knife from her grasp. Res. App. 7, N.T. 9/17/92 at 660. Thus, according to petitioner, he had a wound on his hand that was not self-inflicted but rather was caused by Mock. Petitioner claims that his version of events depended in significant part on his testimony that the decedent had attacked him. Thus, his credibility on this point was a key issue, and whether his account was supported or contradicted by the physical evidence was important. After a careful review, we find that the detective's statement does not contradict the petitioner's version of the facts.

The Pennsylvania Supreme Court found that Detective Williams was merely commenting on the appearance of the cuts that he personally observed, and any error was harmless. *Jacobs,* 727 A.2d at 553. We agree.

First, we note that the petitioner testified at the trial that Mock had injured his *hand* (Res.App. 7, N.T. 9/17/92 at 672) and that the wounds on his *arms* were self-inflicted. *Id.* at 674. The detective's testimony regarding cuts on the petitioner's arms does not conflict with the petitioner's testimony. The detective testified as follows: "I noticed that [Jacobs] had superficial cuts on both arms starting from up in the area of the inside of the arm forearm the whole way down to his wrist, and if I'm correct, there were ten cuts in this fashion across his arms (indicating). Ten on his left arm and I think eleven on his right arm in the same fashion, across—they appeared to be superficial, one or two were may be a little bit deeper. They appeared to me to be self-inflicted." Res.App. 6, N.T. 9/16/92 at 462. The detective further testified regarding police photographs of the cuts on the petitioner's arms. *Id.* at 462–463.

Accordingly, from the testimony itself, it appears any error that occurred was harmless. The petitioner discussed cuts on his *hand* that he alleged were caused by Mock. The detective made clear that he was discussing the cuts that he observed on the petitioner's *arm*. The petitioner admitted that the wounds the detective discussed were self-inflicted. The following exchange occurred at the trial between the petitioner and his counsel:

Q. Did—When you were photographed by the police, and those photographs were also admitted into evidence, they reflected some injuries on your arms.

A. Yes.

Q. How did that happen?

A. I did it.

Q. You inflicted those injuries upon yourself?

A. Yes, I did.

Q. And was that after February 10th?

A. Yes, it was.

Q. And before the police arrested you?

A. Yes.

Res.App. 7, N.T. 9/17/92 at 674.

Furthermore, the defense in the case was that Jacobs lost control and murdered Tammy Mock after Mock had drowned their baby. *See* counsel's closing argument, Res.App. 7, N.T. 9/17/92 at 726, 729—730, 735. Petitioner was allegedly provoked because he found the baby, Holly Jacobs, dead in the bathtub. *Id.* at 736–738, 741, 745–746. The reason he lost control, according to the trial counsel's theory, was the death of the baby, not because Mock had cut him on the hand or any kind of self-defense. Accordingly, we find that the Pennsylvania Supreme Court did not err in finding that Detective Williams was merely commenting on the appearance of the cuts that he personally

observed, and any error was harmless. Accordingly, there can be no ineffectiveness of counsel for failing to raise the issue, and the habeas corpus claim will be denied.

### 6. *Corpus Delecti*

Petitioner also claims that the trial court failed to instruct the jury properly on *corpus delicti* and thus violated Pennsylvania law, reduced the Commonwealth's burden of proof and denied him his Fourteenth Amendment rights. Further, petitioner avers that prior counsel was ineffective for failing to raise this claim.[11]

■ Under Pennsylvania law regarding *corpus delicti*, the jury must be convinced that the Commonwealth established beyond a reasonable doubt that a crime has been committed before considering an admission or a confession by an accused. *Commonwealth v. Fried,* 327 Pa.Super. 234, 475 A.2d 773, 781 (1984). In the instant case, the petitioner claims that the court's instruction on this issue was not sufficiently clear.

Respondents claim that this is a state law issue and a federal court cannot issue a writ of habeas corpus based on a perceived error in state law. For this proposition, respondents cite *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). While it is true that the Supreme Court does so hold in *Pulley,* a state law error can nonetheless be so egregious that it rises to the level of a Due Process violation. For example, the Due

Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Government of Virgin Islands v. Parrilla,* 7 F.3d 1097, 1100 (3d Cir.1993) (citing *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

■ In the instant case, the petitioner claims that the court did not properly instruct the jury that it had to find beyond a reasonable doubt, that a crime had been committed before considering any statements made by the defendant. He contends that the failure to so instruct the jury unconstitutionally reduced the Commonwealth's burden of proof and violated his due process rights.

■ The Pennsylvania Supreme Court found as follows on the *corpus delecti* issue: "Because Appellant's mother's statement regarding Appellant's confession related to both the death of Tammy Mock and the death of Holly Jacobs, and as the Commonwealth established the corpus delecti as to the death of Tammy Mock, the closely related crime exception to the corpus delecti rule applied. Thus, neither trial counsel, nor PCRA counsel, was ineffective in failing to raise this issue."[12] *Jacobs,* 727 A.2d at 552. We will not disagree with the Pennsylvania Supreme Court that an exception to the *corpus delecti* rule applied as to Holly Jacobs, as it is the ultimate interpreter of Pennsylvania

---

11. The respondents claim that the *corpus delecti* issue presented by the petitioner was not raised in state court. While it is true that the Pennsylvania Supreme Court did not address the issue in its opinion, it was raised in the petitioner's PCRA brief. *See* Res.App. 18, Initial Brief, at 59–64. Merely because the state court's opinions do not address the issue does not necessarily mean that it is unexhausted. The petitioner may, by presenting his state court pleadings and briefs, demonstrate that he has presented, and thus exhausted, the legal theory and supporting facts asserted in the federal habeas petition regardless of whether the state court discussed or based

their decision on the claims. *Doctor,* 96 F.3d at 678.

12. The "closely related crime" exception to the *corpus delecti* rule is relevant when a defendant is charged with more than one crime. If the defendant makes a statement related to all the crimes charged, but the prosecution is only able to establish the *corpus delecti* of one of the crimes, the statement of the accused will be admissible as to all the crimes charged where the relationship between the crimes is sufficiently close. *Commonwealth v. Jacobs,* 556 Pa. 138, 727 A.2d 545, 552 (1999).

state law, and the petitioner does not challenge that finding.

We further conclude that the court did not err in charging the jury on *corpus delecti*. In the instant case, the court instructed the jury that the government's burden of proof is beyond a reasonable doubt and that "it is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the Defendant is guilty of that crime beyond a reasonable doubt. . . ." Res. App. 8, N.T. 9/18/92 pgs. 774–75, *also see generally* pgs. 774–79. Now here did the court indicate that a lower burden of proof is allowed.

Specifically as to the *corpus delecti* rule, the court instructed as follows: "Before you consider the statement as evidence against the Defendant you must find, first, that a crime in fact was committed; second, that the Defendant in fact made the statement; and third, that the statement was voluntary. Otherwise, you must disregard the statement." *Id.* at 787. The court did not indicate that a lower burden of proof was to be used. The court proceeded to state: "There does not appear to be a great deal of dispute that a crime was in fact committed, at least in regard to the death of Tammy Mock. Now, that doesn't—my saying that doesn't make it a fact. Nothing is a fact in the case until you as jurors determine it to be a fact, but in the arguments of counsel, that was what I understood defense counsel to indicate. That's the only reason I'm saying that. But that's something for you to determine when you get out to the jury room." *Id.* at 788, 727 A.2d 545.

The court, therefore, made it clear that the jury had to determine that a crime had been committed before addressing the statement. Moreover, as set forth above, the jury was thoroughly charged on the Commonwealth's burden of proof. No other level of proof was mentioned by the court except "beyond a reasonable doubt." Accordingly, we find that the jury was properly instructed, and the petitioner's

claims of error and ineffectiveness of counsel will be denied.

Even if the court had not instructed correctly, the error would have been harmless. Abundant evidence existed that a crime had been committed with regard to Tammy Mock. Counsel could not have seriously argued otherwise. In fact, petitioner's counsel conceded before the Pennsylvania Supreme Court that the *corpus delecti* had been established with regard to Tammy Mock. *Commonwealth v. Jacobs*, 727 A.2d at 552, Res.App. 18, Brief in Support of PCRA Appeal, at 59 n. 27. The Pennsylvania Supreme Court found that the closely related crime exception applied to Holly Jacobs. Accordingly, any error would have been harmless, because no reasonable jury could have found that the *corpus delecti* had not been established.

### 7. Did Commonwealth prove beyond a reasonable doubt that the petitioner murdered Holly Jacobs?

██ Petitioner next argues that no rational jury could conclude that the Commonwealth proved beyond a reasonable doubt that he murdered Holly Jacobs. The law provides that the Due Process Clause of the Fourteenth Amendment is violated and a defendant is entitled to habeas relief when no reasonable jury could conclude beyond a reasonable doubt that the elements of the crime, as defined by state law, had been proven. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

██ Petitioner's entire argument is that the Commonwealth could not establish the *corpus delecti* without reference to the statement made by petitioner's mother. Accordingly, *corpus delecti*, an element of the crime, could not be established and the verdict against the petitioner was improper. However, as addressed above, we have found that the *corpus delecti* rule was not violated, and the jury could properly have considered the statement that

the petitioner made to his mother. Petitioner's argument, therefore, is without merit.

## 8. Improper argument of prosecution

Next, the petitioner claims that he was denied his constitutional rights to due process and to a fair and impartial trial when the prosecutor engaged in improper argument, defense counsel ineffectively failed to object, and the court took no action to cure the error. Petitioner's contention concerns the following issues discussed in the prosecutor's closing argument: A) cuts on the petitioner's hands/police investigation of the crime; B) prosecutor's personal belief in the evidence presented at trial; C) prosecutor's own personal recollection of the testimony; and D) the testimony of the Commonwealth's witness, Delois Jacobs. Pet. ¶¶ 100–109.

In essence, the petitioner's claim of improper prosecutorial argument sounds of prosecutorial misconduct. *Werts v. Vaughn,* 228 F.3d 178, 197 (3d Cir.2000). The law provides:

> The Supreme Court has held that federal habeas relief may be granted when the "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The Court further opined that for due process to have been offended, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))). See also *Ramseur v. Beyer,* 983 F.2d 1215, 1239 (3d Cir.1992) (our review of a prosecutor's conduct in a state trial in a federal habeas proceeding is limited to determining whether the prosecutor's conduct "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Greer,* 483 U.S. at 765, 107 S.Ct. 3102)). This determination will, at times, require us to draw a fine line—distinguishing between ordinary trial error on one hand, and "'that sort of egregious misconduct which amounts to a denial of constitutional due process'" on the other hand. *Ramseur,* 983 F.2d at 1239 (quoting *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 678 (3d Cir.1976)).

> In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial. *Ramseur,* 983 F.2d at 1239 (citing *Greer,* 483 U.S. at 766, 107 S.Ct. 3102, 97 L.Ed.2d 618). The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights. *Greer,* 483 U.S. at 766, 107 S.Ct. 3102 (citing *Donnelly v. DeChristoforo,* 416 U.S. at 639, 94 S.Ct. 1868, 40 L.Ed.2d 431).

*Id.* at 197–98.

■ Moreover, "[w]hile the prosecutor and defense counsel share a responsibility to confine arguments to the jury within proper limits, occasionally, during the heat of argument, counsel makes remarks that are not supported by the testimony and which are or may be prejudicial to the defendant. *United States v. Young,* 470 U.S. 1, 8 & 10, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (citation omitted)." *Werts v. Vaughn,* 228 F.3d at 199. However, a defendant's conviction can only be vacated where the prosecutor's remarks, taken in the context of the trial as a whole, were sufficiently prejudicial to have deprived the defendant of his right to a fair trial. *United States v. Retos,* 25 F.3d 1220, 1224 (3d Cir.1994).

■ Overall, we find that the prosecutor's remarks were fair comment on the

evidence presented at the trial and proper discussion of reasonable inferences that could be derived from the evidence. *See Werts,* 228 F.3d at 205. Nevertheless, we shall address all of the petitioner's contentions.

## A. Cuts on petitioner's hands/police investigation of the crime

The first portion of the closing argument that the petitioner complains of deals with the prosecutor discussing the cuts found on the petitioner's arms. As discussed above, when the police arrested the defendant, he had numerous cuts on his arms. According to the petitioner's testimony, the cuts on his arms were self-inflicted. However, he also claimed that he was cut on the hand by Tammy Mock. The argument regarding these issues was as follows:

> The Defendant says he was cut as a result of this argument [with Tammy Mock]. Now, the Detective, Detective Williams, testified that he did observe cuts, what appears to be self-inflicted cuts, on the Defendant. Okay. The Detective did not observe nor was he asked nor do the photographs show any cuts on the hand, and perhaps we should have explored more further where the cut was—cuts—cut that the Defendant claims Tammy put on him before he took the knife away.

> But I suggest to you if it was serious, if it was any justification for what happened next, it would have been seen. It would have been photographed by the police because the police did see these things. And by the way, the other thing significant about this and the fact that these are self-inflicted wounds....

Res.App. 7, N.T. 9/17/92, at 756–57.

Petitioner contends that the prosecutor improperly aligned himself with the police by referring to what action "we" would have taken, thus vouching for the Commonwealth and directly placing his own credibility and that of the prosecutor's office alongside that of the police. Pet.

¶ 102. Petitioner also raises the issue of vouching with respect to the police investigation in the following manner: "[R]elying by implication on his personal knowledge of how the police conduct investigations, the prosecution assured the jury that if the evidence had supported Petitioner's contention [that he had cut his hands], the police would have found it and taken pictures." *Id.* We are unconvinced by petitioner's arguments.

The law provides as follows: "Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury.... Vouching is distinguishable from a personal opinion based on the evidence presented at trial." *United States v. Dispoz–O–Plastics, Inc.,* 172 F.3d 275, 283 (3d Cir.1999).

The Supreme Court has held:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) *quoted in Dispoz–O–Plastics,* 172 F.3d at 283.

Two criteria must be met for the court to be able to find vouching: (1) the prosecution must assure the jury that the testimony of a government witness is credible; and (2) the assurance must be based on either the prosecutor's personal knowledge or other information not contained in

the record. *United States v. Saada,* 212 F.3d 210, 225 (3d Cir.2000).

In *United States v. DiLoreto,* 888 F.2d 996 (3d Cir.1989), it was found to be unconstitutional vouching for the government to state, "We don't take liars. We don't put liars on the stand. We don't do that." *Id.* at 998, 888 F.2d 996.[13] It was improper because the prosecution was implying to the jury that it had extraneous evidence, unknown and unavailable to the jury, that convinced the prosecutor that the witness was telling the truth. *Id.* at 999.

Likewise, in *Dispoz–O–Plastics,* the court found inappropriate vouching where the prosecution mentioned evidence not in the record to convince the jury that the witnesses were telling the truth. *Dispoz–O–Plastics,* 172 F.3d at 284. In the instant case, the prosecuting attorney did not imply to the jury that it had extraneous evidence, unknown and unavailable to the jury which convinced him that the Commonwealth witnesses were telling the truth.

With regard to the cuts on the hands, we cannot find improper vouching. The prosecutor was merely discussing the evidence (that the police photographed the cuts which were seen on the petitioner's arms) and inferences from that evidence (petitioner did not have serious cuts on his hands or the police would have seen and photographed them). Consequently, we cannot award any relief to the petitioner based upon this argument.

**B. Did counsel impermissibly express his personal opinion that petitioner was guilty of first degree murder?**

 Petitioner contends that the prosecutor impermissibly told the jury that he personally believed in the evidence presented at trial. The prosecution argued as follows in the closing argument: "And in this particular case, ladies and gentlemen,

I think the evidence is crystal clear beyond a doubt that the conduct shows the state of mind necessary to have specific intent." Res.App. 7, N.T. 9/17/92 at 750. Under the law, it is unprofessional conduct for a prosecutor to express his personal belief in an accused's guilt. However, if the statement is based on evidence in the case, the conduct is not reversible error. *United States v. LeFevre,* 483 F.2d 477, 479 (3d Cir.1973); *Government of Virgin Islands v. Joseph,* 770 F.2d 343, 349 (3d Cir.1985). In the instant case, the prosecutor's statement makes clear that he is basing his opinion on the evidence.

Moreover, the court charged the jury that the closing arguments were not evidence. The court instructed as follows:

> ...Counsel have already indicated this to you but it is part of the standard Court instruction so I'll repeat it, although I think it is fairly clear to you already. Speeches of counsel are not part of the evidence and you should not consider them as such. However, in deciding the case, you should carefully consider the evidence in light of the various reasons and arguments which the lawyer presented.
>
> It is the right and duty of each of the lawyers to discuss the evidence in a manner which is most favorable to the side he represents. You should be guided by the lawyer's argument to the extent that it's supported by the evidence and insofar as it aids you in applying your own reason and common sense. However, you're not required to accept the arguments of either lawyer. It's for you and you alone to decide the case based on the evidence as it was presented from the witness stand and in accordance with the instructions that we're now giving you.

Res.App. 8, N.T. 9/18/92 785.

Based on this charge and the fact that the prosecutor was stating his opinion

---

**13.** *DiLoreto,* was overruled by *United States v. Zehrbach,* 47 F.3d 1252 (3d Cir.1995) *cert. denied* 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995). However, the proposition for which we are citing *DiLoreto* was not disturbed by *Zehrbach.*

predicated on the evidence, we find no constitutional error.

### C. Prosecutor's recollection of testimony

Petitioner further alleges that the prosecutor improperly expressed his own personal recollection of the petitioner's testimony. We disagree.

Petitioner claims that the following statements from the prosecutor's closing argument were improper: "Now you particularly need to recall the testimony of Mr. Jacobs today because, as I understood the testimony, he didn't really dispute that.... Your recollection will control but I understood him to testify that ...." Res.App. 7, N.T. 9/17/92 at 755. We find that these statements do not require reversal of the defendant's conviction. We cannot find that the prosecutor improperly expressed his own personal opinion. In addition, in the above-quoted statements that the petitioner deems improper, the prosecution explains that it is the jury's recollection that controls. These remarks in the context of the entire trial (including the court's instruction quoted above) are not sufficiently prejudicial to violate the defendant's due process rights. *See United States v. Green,* 25 F.3d 206, 210 (3d Cir.1994).

### D. Commonwealth's witness Delois Jacobs

Petitioner complains that the following portion of the prosecution's closing argument regarding Delois Jacobs was unconstitutional: "What is the motivation of Delois Jacobs? There is not a person in this world who is not sympathetic to Delois Jacobs. But Delois Jacobs did the right thing eventually." Res.App. 7, N.T. 9/17/92 at 764. Petitioner claims that the prosecutor gave what amounted to his personal assurance that the jury should credit Ms. Jacobs' testimony because her actions were "the right thing." We disagree. The prosecutor was merely making fair comment on the evidence presented and

inferences that could be derived therefrom.

Petitioner also claims that the following argument made by the prosecution in closing was improper: "Delois did not back down at the preliminary hearing. You heard her testify in this courtroom that she didn't back down at the preliminary hearing. She stuck by her guns and indeed she admitted that that is what she accurately testified to prior, and that it was accurate as to what her son had told her." Res.App. 7, N.T. 9/17/92 at 766. The quote refers to whether the witness revoked her testimony from the preliminary hearing after the petitioner confronted her. Petitioner claims that no evidence was presented at trial on which counsel could have based its argument. We find the petitioner's claim to be without merit.

At trial, the following exchange took place between the prosecuting attorney and Delois Jacobs:

> Q: Well now, Mrs. Jacobs, after you said [at the preliminary hearing] what Danny told you, that he didn't want Tammy's family to have her, didn't the Defendant stand up and say, I did not. And then you said again, I'd rather see her dead than to see Tammy's family with her, that's what Danny told me. And Danny again said to you during this hearing, Why are you doing this to me? You're lying. You're my mother.
>
> And you did not change what you said under oath on March 6th, did you?
>
> A: No.

Res.App. 6, N.T. 9/16/92 at 550.

Petitioner advances a narrow interpretation as to the meaning of this exchange. He claims that Ms. Jacobs was only responding to the last question, that is: "And you did not change what you said under oath on March 6th, did you?" However, based on the above-quoted question and the answer thereto, we find that counsel's argument was fair comment on the evidence presented at trial.

Lastly, petitioner makes a general statement in his petition for habeas corpus that the prosecution implied that extraneous evidence, not presented to the jury, existed and "corroborated" his guilt. Petition ¶ 108. Petitioner does not state specifically where this implication is made, and a review of the closing argument reveals no such implication. Accordingly, we afford no weight to this argument.

We find no constitutional error in the prosecution's closing argument. Based on the whole context of the trial evidence, the closing arguments themselves and the judge's charge, we find that petitioner was not denied a fair trial because of the prosecution's comments. Accordingly, the petitioner's claim will be denied.

### 9. Miscellaneous moot arguments

Petitioner raises several other issues that address the legality of the defendant's death sentence. As we have already determined that the death sentence violated the petitioner's rights, these issues are now moot, and we will not address them.[14]

### 10. General ineffectiveness claim

Petitioner also contends that state court counsel were ineffective to the extent that they failed to raise and/or properly litigate the issues discussed in his petition. Respondents claim that this issue was not pled sufficiently as it does not specifically state his grounds for relief and does not include supporting factual allegations as required by Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Court.

We find, however, that the matter is sufficiently pled for us to address it. For the reasons set forth above, for each particular claim, petitioner's argument is with-

out merit. We have found counsel to be ineffective on only one claim, that is failing to investigate and present mitigating evidence, and an appropriate remedy will be ordered for this ineffectiveness. Therefore, a general claim that state court counsel was ineffective for failing to raise and/or properly litigate the issues discussed in his petition is without merit.

### 11. Cumulative prejudicial effect

Lastly, petitioner claims that he is entitled to relief because of the cumulative prejudicial effect of the errors in this case. Respondents contend that we may not address this issue as Jacobs did not raise it in state court. Therefore, they aver it is unexhausted. Respondents further claim that if petitioner now presented the issue to the Pennsylvania Supreme Court, the court would find the issue to be waived and not address it. Accordingly, respondents contend that it would likewise be improper for us to address the merits of the issue. However, as set forth above, in the section discussing whether the state court rule on waiver is "adequate and independent", even if the state court found this issue to be waived, we are still able to review its merits.

Nonetheless, we find no merit to petitioner's claim. We have found only one error in the case, counsel's ineffectiveness for failing to investigate and present mitigating evidence. Accordingly, no cumulative effect of "errors" is present, and the petitioner's claim will be denied.

### Conclusion

After a careful review of the briefs and appendixes of the parties, we find that most of the issues raised by the petitioner are either without merit or moot. No

---

14. The moot issues regarding the legality of the defendant's death sentence are as follows: trial court's instructions on the aggravating circumstance of torture were improper, Pet. ¶¶ 110–117; the jury instructions on the mitigating factor of age was unconstitutional, Id. at ¶¶ 118–124; the court erred in failing to instruct the sentencing jury that if sentenced to life, petitioner would be ineligible for parole, Id. at ¶¶ 125–135; the prosecutor made improper remarks and misstated evidence, with regard to the sentencing, Id. at ¶¶ 136–142; and the death sentence was invalid because the petitioner did not receive the meaningful "proportionality review" mandated by law, Id. at ¶¶ 143–147.

reasons exists for granting a writ of habeas corpus with regard to the guilt phase of the trial. However, the sentence imposed on the petitioner is unconstitutional as it violates his Sixth Amendment right to counsel. Trial counsel performed deficiently by not conducting a mitigation investigation and uncovering facts regarding petitioner's background. Further, counsel failed to discover that the petitioner is mentally retarded, and suffers from other psychological and cognitive disorders. Because trial counsel did not have this information he could not present it to the jury. Petitioner was prejudiced by the counsel's deficient performance because a reasonable probability exists that but for counsel's errors the result of the sentencing proceeding would have been different. Accordingly, the death sentence is unconstitutional and the petition for a writ of habeas corpus will be conditionally granted to allow the state court to resentence the petitioner.